## SUPREME COURT.

### EDWARD J. NEWMAN and others agt. EARLE B. ALVORD and others.

The plaintiffs had, prior to January, 1866, for many years, at or near the village of Akron, in Erie county, N. Y., manufactured largely from the quarries there, *water lime or cement*, which was usually sold in barrels, with a printed bill pasted upon the barrels thus: "Newman's Akron Cement Company, manufacture, at Akron, N. Y.; the Hydraulic Cement, known as the Akron Water Lime." Part of this bill was printed in capitals, "Newman's Akron Cement Co.," and "Akron Water Lime" in large capitals."

The defendants were a firm manufacturing and selling water lime or cement from a quarry or bed in Syracuse, Onondaga county, N. Y., which they in January, 1866, re-named, and called it "Onondaga Akron Cement or Water Lime." The word "Akron" was not used in connection with their quarry until January, 1866. The defendants, in selling their cement, used the brand "Alvord's Onondaga Akron Cement or Water Lime, manufactured in Syracuse, in New York;" and they knew of the plaintiffs' quarries, and the name given to their water lime or cement.

*Held*, that the defendants, by the use of the name or word "Akron," in selling their cement, infringed upon the plaintiffs' *trade mark*; and the plaintiffs were entitled to a perpetual injunction, restraining the defendants from the use of that word.

*It seems*, that if the defendant's quarry and manufacture had been located at Akron also, they would have had an equal right with the plaintiffs to have used the name of Akron in their trade mark, within the principle of the case of *Brooklyn White Lead Co.* agt. *Masury* (25 *Barb.* 416); and that if both parties had had their

quarries and manufactories at another place than Akron, both would have had an equal right to use the name Akron in their trade marks, within the principle of the case of *Wolf* agt. *Goulard* (18 *How.* 64).

*Erie Special Term, November,* 1866.

ACTION to restrain defendants from using a trade mark claimed by the plaintiffs.

It is alleged in the complaint that the plaintiffs are partners, and that they manufacture and sell a water lime or cement, known in the market as "Akron Cement" and "Akron Water Lime," from stone quarried by them in the town of Newstead, near the village of Akron, in the county of Erie, New York, and sold by the plaintiffs at Buffalo, and shipped by them to various places in the western states for sale. That plaintiffs, including their predecessors, have carried on such business for some thirteen years, using the term "Akron Cement" as their trade mark, to designate the origin and quality of their lime and cement; and that they put the trade mark on the barrels in which the lime and cement is packed and sold, &c.

That the defendants are engaged at Syracuse, in the state of New York, in manufacturing and selling water lime and cement, and in shipping the same packed in barrels to their agents in Cleveland, Ohio, and elsewhere, for sale. That the defendants' lime and cement are inferior to that manufactured by the plaintiffs, and do not command in market so high a price, unless it is sold under the trade mark of the plaintiffs. That the defendants have printed, or procured to be printed, a bill, containing, in large letters, among other things, the words "Akron Water Lime;" and that they are pasted upon the barrels of cement or water lime of the defendants, who are selling or causing to be sold such barrels, with the bills pasted thereon. That such cement or water lime was not manufactured at or near Akron. That "cement" or "water lime" means the same thing.

Averments of intention of defendants to mislead, and of their refusal to desist from the use of such trade mark.

Demand of judgment that defendants be perpetually restrained from using the word "Akron" on their bills and in their business, &c., &c.

The defendants, in their answer, admit certain portions of the complaint, and deny other portions.

They allege that they had been for twelve months partners in manufacturing and selling water lime at Syracuse, and that they shipped lime to Cleveland, Ohio, and other places in Ohio, for sale. That the barrels so shipped were not marked with any brand, but that they procured hand bills or circulars for distribution in Ohio, and in no other place, for the purpose of aiding sales, which were thus : "Alvord's Onondaga Akron Cement or Water Lime, manufactured in Syracuse, in New York." Then follows the directions for use.

They deny any intention to injure or mislead the plaintiffs or the public, &c. &c. They aver that the article manufactured by them is a different and superior article, &c.

On the trial, the plaintiffs proved the material facts alleged in the complaint, touching their manufacturing and sale of lime, and their use of the word "Akron." That Akron was the name of the village in or near which the plaintiffs made their lime from the quarry there.

It appears that a person or firm other than the plaintiffs also made lime from the Akron quarries, commencing after the plaintiffs, as the successors of the plaintiffs, and that they used "Akron" on their brands and bills, similar to those used by the plaintiffs. The lime was the same kind as that made by the plaintiffs. The evidence showed that the consent of the plaintiffs was obtained by the other persons or firm to use such word and bills. The evidence showed that the brand used by the plaintiffs was an old and established brand in the market, by which the lime was sold, and that this lime was generally preferred. The sales were large. It was shown that the agents of the defendants for the sale of their lime in Cleveland, Ohio, used a bill, pasted

upon the barrels. It was produced to the court, and is sufficiently described in the opinion. This was in September, 1866. In October the agents were using another bill, which is described in the opinion; also the bills used by the plaintiffs.

The defendants became a firm in January, 1866. Prior to that the firm was Alvord & Brady, for two years, and before that, E. B. Alvord. The defendants called their bed or quarry in Syracuse "Onondaga Akron Cement or Water Lime." The word "Akron" was not used in connection with their quarry until January, 1866. They knew of the plaintiffs' quarries and the lime made by them, and of its reputation, and the name given to it.

Some other facts are stated in the opinion.

JOHN GANSON, *for plaintiffs.*
GEO. N. KENEDY, *for defendants.*

MARVIN, J. The case may be stated briefly thus:

The plaintiffs had, prior to January, 1866, for many years, at or near the village of Akron, in Erie county, manufactured, from the quarries there, water lime or cement. It was usually placed in barrels and sent into the markets and sold, with a bill pasted upon the barrels. This bill was printed, "Newman's Akron Cement Company, manufacture at Akron, N. Y.; the Hydraulic Cement, known as the Akron Water Lime." This part of the bill is printed in capitals: "Newman's Akron Cement Co.;" and "Akron Water Lime" in large capitals.

The article so manufactured by the plaintiffs had become extensively known, and was very largely used. Its reputation in the markets was well established. It was sold in Buffalo, and in Cleveland, Ohio, and other places in the western states.

One of the defendants had been for some years connected with the manufacture and sale of cement or water lime, in Syracuse, Onondaga county, from a quarry there.

January 1st, 1866, the defendants became partners, and they re-named the quarry or bed and called it "Onondaga Akron Cement or Water Lime." Prior to this, the word "Akron" was unknown in connection with their business. They shipped lime in barrels to Cleveland, and their agents there used upon the barrels a printed bill, similar in form to that used by the plaintiffs, though not quite so large, thus: "Alvord's Akron (New York State) Water Lime." Then follows the directions for use.

It appears from the evidence that the defendants had not given their agent, in Cleveland, instruction to use such bills; but on learning that there were complaints made, they did instruct their agent to procure and use bills thus: "Alvord's Onondaga Akron Cement or Water Lime, manufactured in Syracuse, in New York." And the defendants insist that they had a right to give to the article they manufactured this name, and that in doing so they have not infringed upon the rights of the plaintiffs. It should have been stated that the defendants used the bills above described only in Cleveland, Ohio.

It seems to me that the object of the defendants in introducing the word "Akron" into their business cannot be mistaken. The plaintiffs had for many years produced from their quarries an article of cement or water lime, and had sold it extensively, in market, as the hydraulic cement, known as the "*Akron* Water Lime." The company's name was "Newman's Akron Cement Company," and their place of manufacture at "Akron, N. Y." Thus the word "Akron" is used three times in their bill, in a natural and proper manner. The article produced by the plaintiffs had been extensively known, and it was bought and sold under the brand, which was well established. What caused the defendants to change the name of their bed or quarry, in January, 1866, and bring in the word "Akron?" There was no place in Onondaga county by that name, nor in the state of New York, so far as I know, except the little village in Erie county. The word has no signification, except as the name

of a place.    It is not of itself indicative of the *quality* of anything.    What object, then, had the defendants in introducing this word into their business?    Why call the article they manufactured 'Onondaga Akron Cement or Water Lime?"    The answer of counsel, upon the trial, was that the defendants had a right to give to their lime bed or quarry such name as they pleased.    That they had only given their quarry a name to distinguish it from other quarries in the neighborhood.    This answer is not satisfactory, in view of the fact that the defendants knew that there was a place in Erie county known as *Akron,* and that cement was manufactured there and sold in the market as Akron Water Lime, and that it had an established reputation and met with ready sales, especially in Buffalo, Cleveland and other western places.    I cannot think that the word "Akron" was adopted by the defendants by accident, or from mere fancy for the word.    I have no doubt that the defendants expected to derive a benefit from the use of this word, in the increased sales they should make, founded upon the reputation of the article manufactured by the plaintiffs, and that they were not disappointed in such expectation.    If this is so, then I think the plaintiffs should have the relief they ask, unless the settled rules of law are such as to prevent any relief.    I have looked into the reported cases, and in my opinion they are not in conflict with my impressions of the justice of this case.

It is not my intention to discuss the law touching trade marks to any considerable extent; but I have considered and will notice the positions of the defendants' counsel very briefly.

The first is, that the word *Akron,* the name of a place, cannot be appropriated exclusively by the plaintiffs.    *Wolf* agt. *Goulard* (18 *How. Pr. R.* 64), *Burgess* agt. *Burgess* (17 *Eng. L. & Eq.* 257), and *Brooklyn White Lead Company* agt. *Masury* (25 *Barb.* 416), are cited in support of this position. In the first of these cases, the plaintiff had given to his arti-

cle the name "Schiedam Schnapps," and the defendant pre-
pared an article and gave to it the same name, in connection
with his own name.   The parties lived in New York and
made their articles there.  The judge says: "It was admit-
ted on the argument that the word 'Schiedam,' being the
name of a town in Holland, could not be so appropriated by
the plaintiff, and that the word 'Schnapps' was adopted
from the German language, meaning dram.  The judge adds:
"When a person forms a new word to designate an article
made by him which has never been used before, he may
obtain such a right to that name as to entitle him to the sole
use of it as against others who attempt to use it for the sale
of a similar article; but such an exclusive use can never be
successfully claimed of words in common use previously, as
applicable to similar articles."

In the next case, the plaintiff had for many years made an
article and sold it under the name "Burgess' Essence of
Anchovies." His son set up for himself, and manufactured
the article and sold it under the same name, his name
being Burgess.  The judge said: "All the Queen's subjects
have a right, if they will, to manufacture and sell articles and
sauces, and not the less that their fathers have done so before
them.   All the Queen's subjects have a right to sell them in
their own names, and not the less so that they bear the same
name as their fathers; and nothing else has been done in that
which is in question before us."

In the other case, the plaintiffs manufactured white lead,
in Brooklyn, and marked their kegs "Brooklyn White Lead
Company."   The defendant also manufactured white lead in
Brooklyn, and marked his kegs "Brooklyn White Lead and
Zinc Company."   It was held that, as both the parties dealt
in the same article, and both manufactured it at *Brooklyn*,
each had the same right to describe it as Brooklyn white
lead.

In my opinion these cases are not in point.  It is undoubt-
edly true that no one "has a right to appropriate a sign or

symbol which, from the nature of the fact which it is used to signify, others may employ with equal truth, and therefore have an equal right to employ for the same purpose."

This is one of the positions laid down by DUER, J., in the elaborate opinion in *Amoskeag Manufacturing Company* agt. *Spear* (2 *Sandf. S. C. R.* 606). When the plaintiff manufactured an article in New York, and gave it the name of a city in Holland, he could not deprive another person, manufacturing a similar article, from connecting the name of the same city with it. So as to Brooklyn; both parties being manufacturers in that city, each party had a right to indicate the place where his article was made. The question in truth lies deeper. DUER, in the opinion referred to, says that in all cases where a trade mark is imitated, the essence of the wrong consists in the sale of the goods of one manufacturer or vendor as those of another; and it is only when this false representation is directly or indirectly made, and only to the extent in which it is made, that the party who appeals to the justice of the court can have a title to relief. No one has the right to sell his goods as the goods of another.

It is also argued that the party complaining must have a right *exclusive* of all other persons, and that in this case other parties, composing a firm, manufactured cement from the beds of lime at Akron, and that they used the same form of bills, inserting the word "Akron." As to the fact in this case, it was proved that this was done with the consent of the plaintiffs. But, aside from this proof, I am not prepared to concur that no more than one person or firm can acquire a right to a trade mark as against all others. The right sought to be protected must undoubtedly be exclusive of the party complained of. I know that, in speaking of the plaintiff's right, the judges speak of it as exclusive, and it must be exclusive of the defendant, or there will be no cause for complaint.

But, keeping in mind the principles upon which the action is founded, I am not able to see why two or more persons,

or a class of persons, may not have the same right to the exclusion of all other persons. Take this case. The important word to distinguish the article manufactured and sold by the plaintiffs is "Akron," and this is the name of the place where the cement is made, from beds or quarries of lime. The lime in the quarries there is the same in quality, and the process of manufacturing is the same everywhere. Now, as I understand the authorities, the plaintiffs could not probably acquire a right to the use of the word *Akron* by a first appropriation or use, which should exclude his neighbors, manufacturing from the same beds and in the same way, from the use of the word Akron; and yet it would not follow that other persons, having no connection with these beds, should not be excluded from the use of the name "Akron." No case has been brought to my attention presenting the question here presented. The important word is the name of the place where the cement is made; but it indicates to the public far more than simply the place of manufacture, as Brooklyn in the case of the white lead. The article manufactured is taken from the earth. It is a bed or quarry of lime. There is no special art or skill in making it into cement. The process is the same everywhere, and yet the cement made from different beds differs greatly in quality and value. The reputation of plaintiffs' cement arises from the reputation of the bed or quarry from which it is made, the *Akron* bed. Now, why may not the persons making cement from these quarries be protected against the fraudulent use of the word "Akron?" To them this word has become valuable. They have long used it with propriety. They speak the truth in using it. They tell the public, by their bills, this is "Akron Lime." It is made from the Akron beds or quarries. The public have used it for years, and appreciate its qualities. The defendants, manufacturers of cement in another part of the state, from another quarry, distant some 150 miles, knowing all about the plaintiffs and the article they produce, and its reputation in the market, change the name

of their quarry, and incorporate the most significant word used by the plaintiffs for many years, and then prepare bills, with this word prominent in them, and bring their article into markets in competion with the plaintiffs. It seems to me that the simple statement of the case is the strongest argument that can be used against the act of the defendants. They intended that their article should be sold, and they expected that it would be bought, as and for the genuine article produced from the quarries at Akron. They expected that the public would be deceived. It is not enough that they used their own firm name, and designated the place of manufacture as "Syracuse," "in New York," and "Onondaga." How many of those who had for years used the plaintiffs' cement knew where it was made? Akron is a small village in a town in Erie county, of no repute, except in connection with the cement or water lime made from its quarries. Most persons, in Cleveland, for instance, on seeing one of the defendant's bills, with "Akron Cement" in large capitals upon it, would, if he stopped to notice "Onondaga" and "Syracuse," suppose that the "Akron Cement" with which he had been acquainted for years was actually made at Syracuse. To him the name of the manufacturer is of no importance. He knows that the quality of the article is derived from the raw material; that is, the bed or quarry; and he understands that the article thus labeled by the defendants is the genuine article which he has long known and used. (*See also Sess. Laws* 1862, *pp.* 513, 514, *and Laws of* 1863, *ch.* 209.) These statutes are very comprehensive.

The injunction granted should be made perpetual. The plaintiffs should have costs.

This judgment was, upon appeal, affirmed at general term.