Argued September 8, reversed in part, affirmed in part
September 27, 1961

# PILLOUD ET UX v. LINN-BENTON MEMORIAL PARK ASSOCIATION

365 P. 2d 116

*Orval N. Thompson,* Albany, argued the cause for appellant. On the brief were Weatherford & Thompson, Albany.

*Philip Hayter,* Dallas, argued the cause for respondent. On the brief were Hayter & Shetterly, Dallas.

Before ROSSMAN, J., presiding, and PERRY, SLOAN, O'CONNELL and GOODWIN, Justices.

ROSSMAN, J.

This is an appeal by the defendant, Linn-Benton Memorial Park Association, from a decree of the circuit court which (1) enjoined the defendant from using for cemetery or burial purposes any part of its property that lies within 200 yards of the plaintiffs' home, (2) required the defendant "within 120 days after the entry of this decree, to disinter and remove all human remains heretofore buried within a distance of 200 yards from the plaintiffs' said dwelling house" and (3) ordered the vacation as burial ground of the part of defendant's cemetery which lies

within the 200 yard area. The complaint sought that relief. The answer plead estoppel.

ORS 64.060, as amended by 1959 Oregon Laws, Chapter 580, section 102, reads as follows:

"No association, corporation or person shall after February 24, 1903, lay out, open up or use any property for cemetery or burial purposes within 200 yards of any dwelling house, without the consent of the owner of the house having first been obtained in writing.   *   *   *"

The defendant's cemetery lies about four miles north of Albany. The plaintiffs own a tract of land of 98.5 acres, including a dwelling house, which lies in close proximity to the cemetery. The part of the cemetery which is involved in this suit was laid out after 1903. The plaintiffs purchased their tract in 1940 and thereupon moved into the dwelling house. They have occupied it ever since as their home. The house was built prior to 1940 and is plainly visible from the cemetery. In 1940 or some year thereafter the defendant added an area to its cemetery to which the witnesses referred as the Second Addition. The latter is divided into lanes and lots. Each lot is capable of accommodating six burials.

If one arm of a large compass were set in the plaintiffs' home and the other were extended 600 feet southerly the latter arm would reach into the most northerly tier of lots of the Second Addition to a maximum distance of about twenty feet. If that arm of the compass were swung to the east and west in an arc 350 feet long it would touch twenty of the most northerly of the lots. Some of those lots would be entirely included within the arc, but four of the others would be barely touched. Seventeen bodies lie buried in the twenty lots which we just mentioned.

When the defendant laid out the Second Addition it did not have an engineer measure the distance from the plaintiffs' home to the nearest lot, but its manager, as stated in the defendant's brief, "measured as far as a fence, which he considered over half way, and concluded the cemetery was more than 600 feet from the house." He was mistaken; the distance was 580 feet. Shortly after the defendant's manager had made his partial measurement he told the plaintiff, Ed Pilloud, that he had measured the distance and that the defendant "was in the clear." Mr. Pilloud had confidence in the manager and accepted his word.

The answer alleged "some lots were sold and bodies buried therein within 200 yards of the plaintiffs' house. That the plaintiffs ought to be estopped from setting forth and asserting any and all of the matters set forth in plaintiffs' complaint by reason of their action and conduct as hereinafter alleged." The answer averred further that (1) the addition was platted "with the plaintiffs' full knowledge and without any protest being made by them," (2) the plaintiff, Ed C. Pilloud, at times worked in the cemetery as one of the defendant's employees, (3) "the plaintiffs by their conduct acquiesced and caused the said cemetery to be used by the public for the burial of bodies, some within 600 feet of their house  *  *  *  and permitted the purchasers of the lots to bury the bodies of their relatives in said cemetery in said area in the belief that the same was a lawful cemetery for the reception of the dead" and (4) the Second Addition "to said cemetery, some of which is within 600 feet of the house of the plaintiffs, has become charged with a public trust and the plaintiffs are estopped from objecting to the burial of the dead that have been

made in said area and from the burial of said bodies in the future."

The plaintiffs knew nothing about the statute which created the 600 foot set-back line until 1953 or 1954 when a member of the defendant's board of directors told Mr. Pilloud of the statute.

The defendant on several occasions beginning in 1953 sought to secure from the plaintiffs, and even from their predecessor in interest, an agreement authorizing the defendant to make burials in the area which was nearer than 600 feet to the plaintiffs' home. Upon an occasion when one of the defendant's officers discovered that the plaintiffs had not recorded their deed he sought out their grantor and requested that individual to sign an agreement authorizing burials within the 600 foot area. When Mr. Pilloud heard of the effort he deemed it reprehensible and was aggravated. At another time the defendant sought an agreement from Mr. Pilloud, which, if granted, would have authorized burials within 300 feet or so of the plaintiffs' home. At a later time the defendant requested an agreement for burials within 500 feet of the house. In 1953 the defendant's board of directors, according to testimony given by the secretary of the board as a witness for the defendant became concerned over the fact that the plaintiffs had not acquiesced in the defendant's encroachment upon the 600 foot prohibited area. The secretary, referring to the board, testified:

"* * * At one time they instructed Mrs. Bertha Calavan and myself to call on Mr. Pilloud, which we did. We went over and visited with him, and as a matter of fact, asked him if his place was for sale; that we would like to consider the purchase of it for future development of the cemetery.

"Q   What else was done, if anything?

"A   I think other Board members too were asked to call on Mr. Pilloud at different times.

"Q   And were these reports reported back to the Board?

"A   Yes, sir.

"Q   Any action taken on any of them?

"A   There was really no action to take because we couldn't, you might say, deal with Mr. Pilloud. We set up a meeting for him at his convenience."

The purpose of the "meeting for him at his convenience" which the defendant's board of directors had called was to obtain the plaintiffs' acceptance of an offer which the board had made to the plaintiffs to convey to them a small parcel of land as compensation for the plaintiffs' requested consent to burials in the prohibited area. The plaintiffs did not go to the meeting, and the offer yielded no result. On still another occasion a member of the board of directors accompanied by one of Mr. Pilloud's relatives called upon the plaintiffs and sought to gain for the defendant consent to the use of contested area for burial purposes. A heated argument developed in the midst of the visit in the course of which Mr. Pilloud's relative told him that he "was being mean and was taking it out on the community." Presently the talk turned to prospects of litigation and the visit ended.

We take the following from *Bennett v. City of Salem*, 192 Or 531, 235 P2d 772:

"To constitute an equitable estoppel, or estoppel by conduct, (1) there must be a false representation; (2) it must be made with knowledge of the facts; (3) the other party must have been ignorant of the truth; (4) it must have been made with the intention that it should be acted upon by the other party; and (5) the other party must have been

induced to act upon it. *State v. Claypool,* 145 Or. 615, 28 P. 2d 882; *Bramwell v. Rowland,* 123 Or. 33, 261 P. 57; *Oregon v. Portland Gen. Elec. Co.,* 52 Or. 502, 528, 95 P. 722, 98 P. 160; 31 C.J.S., Estoppel, 254, § 67."

■ Under some circumstances a person or corporation in a situation such as that in which the defendant found itself might not know or be able to ascertain whether a neighbor, such as the plaintiffs, approved or objected to the defendant's use of the intervening tract of land for burial purposes. If the neighbor saw burials taking place from time to time within the prohibited area and elected to remain silent or actually manifested acquiescence a basis for an estoppel might be discovered in his long continued course of action. But in the case at bar the plaintiffs gave no sign of acquiescence. Nor did they remain silent. They rejected proposals to permit burials within 300 and 500 feet of their home. On still another occasion, as we have seen, Mr. Pilloud, upon refusing to sign a requested consent, was told that he "was taking it out on the community." Also, as indicated in a preceding paragraph, the plaintiffs stayed away from a meeting called by the defendant in which the latter hoped that the plaintiffs would accept a piece of property as consideration for the desired consent. They never manifested approval of the use of the property for burial purposes.

The plaintiffs did not mislead the defendant. They did not resort to deceptive silence. More than once they made their position clear. They declined to grant the requested consent and even when offered a consideration refused to comply with the defendant's request. Their course appeared to the defendant to be so stubborn that it caused some vexation. Possibly

the plaintiffs were obstinate, but it can not be said that they were deceptive or that the defendant was misled. This case affords no basis for an estoppel.

A previous paragraph of this opinion states that the challenged decree ordered the removal of the seventeen bodies that have been interred in the contested area. The owners of the lots in which those remains have found sepulture are not parties to this suit. The persons who revere the memory of those who lie entombed there and who believed when the bodies were lowered into the grave that they would rest undisturbed in eternal sleep likewise are not parties. If the remains are taken, under the challenged decree, from their resting place it will be done without affording a word of protest to any one who shed tears when the bodies were lowered into the tomb. The sole parties are the plaintiffs, Mr. and Mrs. Pilloud, and the defendant cemetery association. There is no claim that any owner of a lot that encroached upon the 600 foot setback line was aware that his lot violated any law.

All abhor the exhuming of a body. In the days of the Old Testament Job told us, "He that goeth down to the grave shall come up no more." Hardly any spot upon the face of the earth is more sacred and hallowed than that into which the remains of a loved one was lowered to sleep on in undisturbed repose.

The defendant has no property interest in the remains that repose in its cemetery. In fact, no one has a right of property of a material nature in a corpse, although the law acknowledges rights in the family and in the state which can prevent wrongful interference with a corpse and its burial plot: Jackson, The Law of Cadavers, second edition, pages 125-137. One who acquires a lot in a cemetery is not vested with the fee. The right which he acquires is deemed a privilege,

a license or an easement. *City View Cemetery Association v. Salem Mausoleum and Crematorium,* 209 Or 199, 305 P2d 379, and *Mansker v. Astoria,* 100 Or 435, 198 P 199. However, ORS 97.590 recognizes descent of title, upon the death of the owner of a cemetery lot, and ORS 97.570 makes provision whereby the spouse of an owner has a vested right of interment in the burial plot.

ORS 97.130 states:

"The right to control the disposition of the remains of a decedent, unless other directions have been given by him, vests in his surviving spouse, his surviving children, his surviving parents and the person in the next degree of kindred to him, in the order named."

The law recognizes in those who are included in a category of the kind just quoted the right to maintain the grave against desecration, Jackson, The Law of Cadavers, second edition, page 176. ORS 97.220(1) makes provision for lawful disinterment. It says:

"The remains of a deceased person interred in a plot in a cemetery may be removed therefrom with the consent of the cemetery authority and written consent of the person who has the right to control the disposition of the remains of the deceased person. If the consent of any such person or of the cemetery authority can not be obtained * * *."

In a proceeding of that character the cemetery association has no interest in the entombed remains, but it is the owner of the cemetery's lanes which must be used if the remains are to be removed; hence its interest in the proceeding. *City View Cemetery Association v. Salem Mausoleum and Crematorium,* supra.

■ We are satisfied that if in this suit the plaintiffs sought the removal of the remains of those who lie

entombed in the contested area they instituted the suit against an improper party.

The part of the decree which orders the removal of the bodies must be vacated. The remaining parts of the decree are affirmed. Neither party will recover costs.